**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| M. SARRA HANSON, a.k.a. Abbess *Emerita* Aemiliane; SIARHEI KHADASOK, a.k.a. Abbot Christophoros; DEMETRIOS CLARK, a.k.a. Abbot Athanasios; THE SACRED MONASTERY OF SAINT SIDÓNIA, INC., f/k/a The Sacred Monastery of Saint Nina, Inc.; THE SACRED MONASTERY OF THE HOLY SPIRIT, INC.; THE SACRED NEW STUDION MONASTERY OF ST. IAKOVOS, INC.,<br><br>*Plaintiffs*,<br><br>v.<br><br>LASHA INTSKIRVELI, a.k.a. Bishop Saba; GIORGI KATAMADZE, a.k.a. Hieromonk Ieronymos,<br><br>*Defendants*. | CASE NO.: 1:26-cv-6967<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs M. Sarra Hanson ("Abbess *Emerita* Aemiliane"), Siarhei Khadasok ("Abbot Christophoros"), Demetrios Clark ("Abbot Athanasios"), The Sacred Monastery of Saint Sidónia, Inc., f/k/a The Sacred Monastery of Saint Nina, Inc. (the "Saint Sidónia Monastery"), The Sacred Monastery of the Holy Spirit, Inc. (the "Holy Spirit Monastery"), and The Sacred New Studion Monastery of St. Iakovos, Inc. (the "Saint Iakovos Monastery," and, together with Saint Sidónia Monastery and the Holy Spirit Monastery, the "Monastery Plaintiffs") allege:

## NATURE OF THE ACTION

1. This is a case about defamation perpetrated against subordinates (the plaintiffs) by their superior and his associate (the defendants), who had full knowledge of the falsity of their defamatory statements and the damage such false statements would have on the plaintiffs.

2. Abbess *Emerita* Aemiliane, Abbot Christophoros, and Abbot Athanasios (the "Monastic Plaintiffs") are monastics within the Georgian Orthodox Church. As monastics, they have taken vows of poverty, devoted their lives to religious service, and become leaders in their communities.

3. Defendant Lasha Intskirveli ("Bishop Saba") is the presiding bishop of the Georgian Apostolic Orthodox Church in North America ("GAOCNA"), and Defendant Giorgi Katamadze ("Hieromonk Ieronymos") is his "Chief Secretary." By virtue of their positions, Bishop Saba and Hieromonk Ieronymos (the "Defendants") wield influence within the church. The Defendants have improperly used that influence to defame the Plaintiffs in violation of law.

4. The Defendants began their public campaign to discredit and besmirch the Monastic Plaintiffs immediately after the Monastic Plaintiffs voiced conscientious objections to certain actions that Bishop Saba had taken, including his proposal to enact a church constitution that would facilitate seizing for himself any and all monastic property.

5. The campaign against Monastic Plaintiffs featured the Defendants falsely declaring that the Monastic Plaintiffs had been deposed and laicized (*i.e.*, that Abbess *Emerita* Aemiliane was no longer to be the abbess of Saint Sidónia Monastery and that Abbot Christophoros and Abbot Athanasios were to be stripped of their priestly and monastic status). Such sanctions are among the most severe and stigmatizing in the Orthodox community.

6. The Defendants knew their declarations were false because they knew such declarations were baseless. Bishop Saba could not remove Abbess *Emerita* Aemiliane from the position of abbess because she had already resigned from the position—a fact Abbess *Emerita* Aemiliane told Bishop Saba *five months* before he purported to depose her. And Bishop Saba could not permanently strip Abbot Christophoros and Abbot Athanasios of their clerical and

monastic status and duties because Bishop Saba had not followed the requisite procedure outlined in GAOCNA's constitution that he himself had primarily drafted.

7. Under that constitution, a cleric justly accused of ecclesiastical transgressions must first be suspended from functioning as a cleric by Bishop Saba, then must have a substitute appointed by Bishop Saba, and then must have his case ruled upon. According to the plain letter of the constitution, only then may Bishop Saba "render a decision" against the accused cleric, and, even then, only if he "finds that the subject matter is within his exclusive jurisdiction" after "obtaining an understanding of the situation through his representative."

8. The issue is not whether Bishop Saba fairly implemented these procedures, nor is it the meaning or nature of such procedures. The issue is that Bishop Saba *completely failed to follow the procedures* set forth in plain, unambiguous language in the constitution that he himself primarily drafted and sponsored. Bishop Saba never suspended either abbot from conducting their clerical duties; nor did he appoint substitutes for them. Yet, despite knowing that the process was unsound, Bishop Saba—aided by Hieromonk Ieronymos—purported, through broadly publicized declarations, to laicize Abbot Christophoros and Abbot Athanasios.

9. The Defendants widely published and circulated their false narrative that the Monastic Plaintiffs were deposed and laicized to silence the Monastic Plaintiffs, tarnish their reputations, humiliate them, and isolate and alienate the Monastery Plaintiffs from the broader Orthodox community (in the United States and beyond) from which they received monetary and other charitable support. As a result, the Plaintiffs have been gravely harmed—personally, reputationally, and economically.

10. The Defendants' defamatory acts are part of a larger course of conduct involving Bishop Saba's attempts to control and claim title to the Monastery Plaintiffs' property. Before

the defamatory campaign, Bishop Saba drafted and advocated for language that would ultimately form Article 21.7 of GAOCNA's constitution. Article 21.7 provides that, upon an alleged "heresy, schism, or defection, . . . title, management, administration and control" of the property of an affected monastery "shall immediately revert to the Diocesan Bishop."

11. The Monastic Plaintiffs objected to Article 21.7 because it purported to give Bishop Saba a mechanism to seize monastic property. In response, Bishop Saba retaliated by attempting to take monastic property (including holy items belonging to the Monastery Plaintiffs) and issuing the deposition and laicization letters to ostensibly create the very sort of alleged "heresy, schism or defection" predicate he had written into Article 21.7.

12. The Plaintiffs dispute that Article 21.7 gives Bishop Saba any right to claim title over the Monastery Plaintiffs' property. Among other reasons, the plain language of Article 21.7 creates certain conditions that have not (and could not) be met—for example, the Monastery Plaintiffs' property never belonged to Bishop Saba and therefore cannot "revert" to him. Moreover, the Monastery Plaintiffs' own governing documents provide that their property is held by the monasteries themselves and is "inalienable," defeating any attempt by an outside party to seize their property by force. A declaration is necessary to resolve that present property dispute and prevent Bishop Saba from unlawfully seizing the Monastery Plaintiffs' property.

13. Through this action, the Plaintiffs seek redress for the Defendants' false, defamatory, and misleading statements, a declaration that Bishop Saba has no right to claim title to their property under Article 21.7 of GAOCNA's constitution, and justice for the profound injuries the Defendants have inflicted upon them.

## <u>JURISDICTION AND VENUE</u>

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3), because the matter in controversy exceeds the sum or value of $75,000, exclusive

of interest and costs, and is between citizens of different states and in which citizens of a foreign state are additional parties.

15. Plaintiff Abbess *Emerita* Aemiliane is a natural person and a citizen of Maryland.

16. Plaintiff Abbot Christophoros is a natural person, a resident of Maryland, and a citizen of the Republic of Belarus.

17. Plaintiff Abbot Athanasios is a natural person and a citizen of Oklahoma.

18. Plaintiff the Saint Sidónia Monastery is a religious corporation organized under the laws of Maryland, with its principal place of business in Maryland.

19. Plaintiff the Holy Spirit Monastery is a religious corporation organized under the laws of Maryland, with its principal place of business in Maryland.

20. Plaintiff the Saint Iakovos Monastery is a religious corporation organized under the laws of Oklahoma, with its principal place of business in Oklahoma.

21. Defendant Bishop Saba is a natural person and a citizen of Pennsylvania.

22. Defendant Hieromonk Ieronymos is a natural person, a citizen of the country of Georgia, and a resident of New York.

23. Complete diversity exists between the parties.

24. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in New York City. Alternatively, venue is proper pursuant to 28 U.S.C. § 1391(b)(3).

## PARTIES

25. Plaintiff Abbess *Emerita* Aemiliane is a resident of Maryland. She was the Saint Sidónia Monastery's first abbess until August 2024, at which point she resigned.

26. Plaintiff Abbot Christophoros is a resident of Maryland. He is the abbot of the Holy Spirit Monastery.

27. Plaintiff Abbot Athanasios is a resident of Oklahoma. He is the abbot of the Saint Iakovos Monastery, which is also known as The Holy Monastery of Saint Iakovos "New Studion."

28. Plaintiff the Saint Sidónia Monastery is a religious corporation organized under the laws of Maryland. It owns property in Maryland and Oklahoma.

29. Plaintiff the Holy Spirit Monastery is a religious corporation organized under the laws of Maryland, with its principal place of business in Maryland.

30. Plaintiff the Saint Iakovos Monastery is a religious corporation organized under the laws of Oklahoma, with its principal place of business in Oklahoma.

31. Defendant Bishop Saba is a resident of Pennsylvania.

32. Defendant Hieromonk Ieronymos is a resident of New York.

## BACKGROUND

### I. Factual Allegations

#### A. The Georgian Orthodox Church

33. The Georgian Orthodox Church, also known as the Apostolic Autocephalous Orthodox Church of Georgia, is an Eastern Orthodox church within the Orthodox Christian faith that functions as an autocephalous body. The head of the Georgian Orthodox Church is called the Catholicos-Patriarch. Patriarch Ilya II served as the Catholicos-Patriarch of the Georgian Orthodox Church from 1977 until his passing on March 17, 2026. The current Catholicos-Patriarch, Patriarch Shio III, was enthroned on May 12, 2026.

34. The Georgian Orthodox Church is divided into dioceses (sometimes called "eparchies") worldwide, each of which is entrusted to a bishop who serves as the head of his diocese. GAOCNA functions as the North American diocese of the Georgian Orthodox Church.

35. On June 22, 2014, Defendant Bishop Saba became the head of GAOCNA, succeeding the first North American bishop who served from 2009 to 2014. Upon taking his assignment, Bishop Saba became a member of the Assembly of Canonical Orthodox Bishops of the United States of America, which is "made up of all the active, canonical Orthodox bishops in the United States of America, of every jurisdiction."[1]

**B. The Monastery Plaintiffs and Their Property**

36. The Monastic Plaintiffs are monastics within the Georgian Orthodox Church. Monastics are members of a religious order devoted to a life of prayer, communal service, and spiritual discipline.

37. Monastics live in organized communities known as monasteries. Each monastery maintains regular worship, labor, and charitable works, reflecting the monastic ideal of unity between contemplation and service. Monasteries often offer material and moral assistance to the broader community in which they are located. For example, a monastery may host a summer camp for children observing the Orthodox faith.

38. The Monastery Plaintiffs are three separate religious entities that hold assets, including real estate and sacred liturgical items, in furtherance of their monastic missions. Property held by a monastery is not owned by individual monastics, GAOCNA, or Bishop Saba; it is owned and controlled by the monastery itself. In fact, the Monastery Plaintiffs' governing documents protect their property from outside control and provide that the Monastery Plaintiffs' property is "inalienable."

---

[1] *Overview*, Assembly of Canonical Orthodox Bishops of the United States of America, https://www.assemblyofbishops.org/about/overview.

*The Saint Sidónia Monastery*

39. The Saint Sidónia Monastery was ecclesiastically founded on September 25, 2012. Its corporate entity was incorporated on January 25, 2012, under the corporate name "The Holy Monastery of the Entrance of the Theotokos into the Temple, Incorporated." On October 19, 2012, after its ecclesiastical founding, the monastery changed its corporate name to "The Sacred Monastery of Saint Nina, Inc." On September 20, 2024, the monastery changed its corporate name to "The Sacred Monastery of Saint Sidónia, Inc."

40. The Saint Sidónia Monastery is physically located at 13830 St. Benedict Way, Union Bridge, Maryland 21791 (the "Maryland Property"). The Saint Sidónia Monastery owns the Maryland Property.

41. The Saint Sidónia Monastery operates under the Constitution of the Sacred Monastery of Saint Nina, dated September 27, 2012, and its corporate charter. Those governing documents provide that the Saint Sidónia Monastery's property is held by the monastery, not by GAOCNA or Bishop Saba, and that the property is inalienable.

42. Abbess *Emerita* Aemiliane co-founded the Saint Sidónia Monastery and was its first abbess. She resigned from her position as abbess in August 2024.

43. Patriarch Ilya II blessed the founding of the Saint Sidónia Monastery and signed its "antimension." An antimension is a holy liturgical cloth that covers the monastery's church altar and without which a priest cannot perform any sacrament at the monastery, including the sacrament of Holy Communion during the Divine Liturgy, which is the central act of Orthodox Christian worship. The antimension is among the most important furnishings of the altar.

*The Holy Spirit Monastery*

44. The Holy Spirit Monastery was ecclesiastically founded on September 25, 2012.

45. The Holy Spirit Monastery, like the Saint Sidónia Monastery, is physically located at the Maryland Property. The Holy Spirit Monastery has been located at the Maryland Property since 2014.

46. The Holy Spirit Monastery operates under the Constitution of the Sacred Monastery of the Holy Spirit, dated September 27, 2012. The Holy Spirit Monastery also operates under its corporate charter, dated September 22, 2024. Those governing documents provide that the Holy Spirit Monastery's property is held by the monastery, not by GAOCNA or Bishop Saba, and that the property is inalienable.

47. Abbot Christophoros is the Holy Spirit Monastery's abbot. He has served as abbot since August 2014, when he succeeded the previous abbot.

48. Patriarch Ilya II blessed the founding of the Holy Spirit Monastery and signed its antimension.

*The Saint Iakovos Monastery*

49. The Saint Iakovos Monastery was ecclesiastically founded in 2018. Its corporate entity was incorporated on December 10, 2019, under the corporate name "The Sacred New Studion Monastery of St. Iakovos, Inc."

50. The Saint Iakovos Monastery is physically located at 20000 N. County Line Road, Piedmont, Oklahoma 73078 (the "Oklahoma Property"). The Oklahoma Property is owned by the Saint Sidónia Monastery. The Saint Iakovos Monastery rents the property from the Saint Sidónia Monastery.

51. The Saint Iakovos Monastery operates under its corporate charter, dated February 23, 2024. That governing document provides that the Saint Iakovos Monastery's property is held by the monastery, not by GAOCNA or Bishop Saba, and that the property is inalienable.

52. Abbot Athanasios was the first abbot of the Saint Iakovos Monastery and continues to serve in that role.

53. Patriarch Ilya II blessed the founding of the Saint Iakovos Monastery and signed its antimension.

### C. Bishop Saba Calls for GAOCNA's First Plenary Assembly to Deliberate and Enact His Recommendation for GAOCNA's First Constitution

54. On or about November 14, 2023, Defendant Bishop Saba convened a multiday session of the Plenary Assembly (GAOCNA's principal legislative body) at the Saint Iakovos Monastery. Bishop Saba, GAOCNA priests, and layperson representatives from each parish attended. This was the first session of the Plenary Assembly ever held.

55. The central focus of the Plenary Assembly session was to discuss and deliberate Bishop Saba's proposed language for a Constitution of the Georgian Apostolic Orthodox Church in North America (the "GAOCNA Constitution"). GAOCNA had not previously enacted a constitution.

56. The draft constitution that Bishop Saba proposed included Article 21.7, which contained language governing the treatment of property, including property held by monasteries, in the event of "heresy, schism or defection." The full language of Article 21.7, as proposed and ultimately included in the constitution, is reproduced below. *See infra* II.A.

57. That provision, among others, was problematic because—as Abbot Christophoros stated at the Plenary Assembly session—it allocated property rights to Bishop Saba (as opposed to GAOCNA) and lacked procedural safeguards.

58. Bishop Saba and those assisting him refused to address Abbot Christophoros' concerns on their own terms, and instead simply repeated the proposed language and its purpose. For example, Jeffrey Land (a.k.a. Father Basil)—who, upon information and belief, attended the

Plenary Assembly session to assist Bishop Saba—told Abbot Christophoros that the purpose of the proposed constitutional provisions was "to protect the Church, not heretics," and when Abbot Christophoros continued to press his concerns about the lack of procedural safeguards and the irregularity of allocating property rights to a bishop individually as opposed to GAOCNA, Jeffrey Land publicly advised Bishop Saba at the Plenary Session that Abbot Christophoros could not be satisfied and that the Plenary Assembly discussion should move forward.

59. As the primary drafter of the proposed GAOCNA Constitution, Bishop Saba was also the primary drafter of this Article 21.7.

60. The GAOCNA Constitution was purportedly entered into force during the April 25, 2024 session of the Plenary Assembly.

### D. The Monastic Plaintiffs Request a Canonical Release Given Their Unanswered Concerns About Bishop Saba's Proposed Constitution

61. In November 2023, the Monastic Plaintiffs—jointly and individually—sent letters to Bishop Saba, requesting that he release the Monastery Plaintiffs from GAOCNA. Among the bases for the Monastic Plaintiffs' request was their concern about Article 21.7 of the GAOCNA Constitution.

62. On December 5, 2023, Bishop Saba summoned the Monastic Plaintiffs to his Pennsylvania residence. That meeting occurred on December 13, 2023.

63. During that meeting, Bishop Saba stated that he did not understand why the Monastic Plaintiffs were worried about Article 21.7 of the GAOCNA Constitution. He told the Monastic Plaintiffs that he believed the only reason they were taking issue with Article 21.7 was because they were planning to create a schism (which was not true).

64. On October 25, 2024, Abbess *Emerita* Aemiliane sent Bishop Saba a letter informing him that she had resigned as the Saint Sidónia Monastery's abbess, and that Abbess Sidónia had been elected her successor.

65. Abbess *Emerita* Aemiliane's letter also stated her concern that Bishop Saba had drafted Article 21.7 of the GAOCNA Constitution to seize monastic property at his discretion.

66. On November 28, 2024, approximately 12 months after the Monastic Plaintiffs requested a release, Bishop Saba sent a substantively identical letter to each of the Monastic Plaintiffs stating that he had "made the decision to release [the Monastery Plaintiffs] from the jurisdiction of our Holy Diocese of North America," conditioned on "the presentation of a formal letter from a competent canonical Orthodox Hierarch . . . stating that he is taking [the Monastery Plaintiffs] under his canonical jurisdiction."

67. However, Bishop Saba's letter stated that he was granting the Monastic Plaintiffs only three months (until approximately February 28, 2025) to find another jurisdiction to accept the Monastery Plaintiffs.

68. The Monastic Plaintiffs did not obtain a formal letter of acceptance from another Orthodox jurisdiction by Bishop Saba's three-month deadline.

**E. Bishop Saba Unsuccessfully Attempts to Seize Monastic Property**

69. In mid-March 2025, shortly after Bishop Saba's imposed three-month deadline for the Monastic Plaintiffs to find another jurisdiction had passed, Bishop Saba orchestrated an initial attempt to seize property from the Monastery Plaintiffs.

70. As to the Saint Iakovos Monastery, Bishop Saba's first attempt to seize property took place on the evening of March 14, 2025. That evening, Defendant Hieromonk Ieronymos, on behalf of Bishop Saba, called Jeffrey Land (a.k.a. Father Basil), who was with Abbot Athanasios and another monk, and instructed Jeffrey Land to seize the Saint Iakovos

Monastery's antimension and bring it to Bishop Saba in Pennsylvania. During the call, Hieromonk Ieronymos served as a translator for Bishop Saba, who was present beside him.

71. Jeffrey Land attempted to find the antimension but could not locate it.

72. As to the Saint Sidónia Monastery, Bishop Saba's first attempt to seize property took place on March 15, 2025. That afternoon, Bishop Saba sent two clergymen (Father Paul and Father George) and some laymen to Saint Sidónia Monastery who, on behalf of Bishop Saba, made a verbal demand that the monastery surrender two items: (1) the monastery's antimension that Catholicos-Patriarch Ilya II had signed and that, as explained above, is among the most important furnishings of the altar without which no Divine Liturgy and no other sacrament can be performed; and (2) the monastery's Holy Myrrh, another important liturgical item that consists of sacred oil used in Holy Sacraments such as Chrismation, which, with Baptism, establishes membership in the church.

73. Abbot Christophoros, who was at the Saint Sidónia Monastery when Bishop Saba's delegation arrived, asked the men to display an official written order from Bishop Saba demanding the seizure. Abbot Christophoros made this request because he thought it important to create a chain-of-custody paper trail that would otherwise be absent in the face of a mere verbal demand. The paper trail would also be critical should any questions arise regarding the holy items if they were lost post-seizure, and if accusations arose regarding how, when, and why such items were lost.

74. Bishop Saba's envoys were not able to present such a written order demanding the seizure, and thus Abbot Christophoros refused to surrender the monastery's property. The men left the monastery.

75. As the men were leaving, one handed Abbot Christophoros a phone that had Bishop Saba on the other end of the line. Bishop Saba was irate and demanded that Abbot Christophoros surrender the monastery's holy property, claiming that it was not just Bishop Saba's decision, but also the decision of the Patriarchate of Georgia (*i.e.*, the central governing body of the Georgian Orthodox Church).

76. Abbot Christophoros replied that if that were so, he would then wait to receive two written demands to surrender the monastery's holy items—one from Bishop Saba and one from the Patriarchate of Georgia.

77. Bishop Saba shouted in response that *he* was the Patriarchate of Georgia and that he would provide a written demand for the monastery's property within five minutes, which he did not do.

### F. Bishop Saba Retaliates Against the Monastic Plaintiffs by Sending Them Sham Deposition and Laicization Letters

78. Less than a month after Bishop Saba's arbitrary three-month time for the Monastic Plaintiffs to find another jurisdiction had expired, and mere days after Bishop Saba's first attempt to seize monastic property, Bishop Saba's Chief Secretary, Hieromonk Ieronymos, sent each of the Monastic Plaintiffs an email on March 18, 2025, directing them to an attached "Hierarchical Letter of his Grace, Bishop Saba" dated March 17, 2025.

79. Bishop Saba's letter to Abbess *Emerita* Aemiliane stated: "I write to inform you that . . . I have deposed you from the position of Abbess of [the Saint Sidónia Monastery] . . . You are no longer entitled to exercise any authority or administrative duties over [the Saint Sidónia Monastery]." The phrase "to depose someone from the position of abbess" means to remove that person from the position and strip them of their attendant authority.

80. Bishop Saba's letters to Abbots Christophoros and Athanasios were substantively identical. In both letters, Bishop Saba stated: "[I] write to inform you that . . . I have laicized you from the clerical state. . . . [Y]ou are no longer entitled to perform any priestly duties." The term "laicization" means to return a member of the clergy or a monastic order to the lay state, meaning that the individual is no longer considered a monk or allowed to function as a cleric and thus no longer authorized to perform any Holy Sacrament, including the Holy Sacrament of Holy Communion during the Divine Liturgy.

81. Despite his letters, Bishop Saba knew that he could not depose Abbess *Emerita* Aemiliane and he knew that the steps he took to purportedly laicize Abbot Christophoros and Abbot Athanasios were unsound.

82. As to Abbess *Emerita* Aemiliane, Bishop Saba knew at the time he sent his March 17, 2025 letter that she had resigned from the position of the Saint Sidónia Monastery's abbess because Abbess *Emerita* Aemiliane had told him of her resignation by letter dated October 25, 2024—nearly *five months earlier*. Bishop Saba thus knew that he could not depose Abbess *Emerita* Aemiliane from the position of abbess given that she no longer held that position (how can one depose someone from a position they no longer hold?).

83. Upon information and belief, Bishop Saba's Chief Secretary, Hieromonk Ieronymos, also knew that Abbess *Emerita* Aemiliane had resigned from the position of abbess of the Saint Sidónia Monastery before he sent her Bishop Saba's March 17, 2025 letter via email dated March 18, 2025.

84. Bishop Saba's attempt to depose Abbess *Emerita* Aemiliane from her position as abbess was thus a charade.

85. As to Abbot Christophoros and Abbot Athanasios, Bishop Saba knew at the time he sent his March 17, 2025 letters that he had not followed the procedures plainly stated in the GAOCNA Constitution (that he himself principally drafted and sponsored). According to those procedures, as detailed in Article 12.8(14) of the GAOCNA Constitution, a cleric must first be "justly accused of ecclesiastical transgressions." After that, the bishop (*i.e.*, Bishop Saba) must temporarily "suspend" the cleric from liturgical-sacerdotal officiation and then appoint a "substitute" to replace the cleric while the case is ruled upon. Only once those steps have been taken, and only after the bishop has "obtain[ed] an understanding of the situation through his representative," may the bishop then "render a decision"—and even then, the bishop may only do so if he "finds that the subject matter is within his exclusive jurisdiction" (otherwise, he must "submit[] the case to the Diocesan Ecclesiastical Court for action").

86. Even putting aside whether Abbot Christophoros and Abbot Athanasios were ever "justly accused of an ecclesiastical transgression," Bishop Saba did not follow the plain letter of the GAOCNA Constitution because he did not suspend either abbot from liturgical-sacerdotal officiation nor appoint any substitutes to replace them while their cases were pending (nor did he ever make a determination, after obtaining a full understanding of the matter from a representative, regarding whether he had jurisdiction to render a judgment directly). Pursuant to the unambiguous language of the GAOCNA Constitution, each of these conditions had to be satisfied before Bishop Saba could take any action against Abbot Christophoros or Abbot Athanasios. As the primary drafter of the GAOCNA Constitution, Bishop Saba was well aware of this process.

87. Bishop Saba's attempts to laicize Abbot Christophoros and Abbot Athanasios were thus specious.

88. In sum, Bishop Saba's deposition and laicization letters were performative and hollow, and constituted a contrived false pretext to justify the Defendants' past and continued attempts to seize monastery property under Article 21.7 of the GAOCNA Constitution.

**G. Bishop Saba's Second Unsuccessful Attempt to Seize Monastic Property**

89. On March 27, 2025, approximately ten days after Bishop Saba sent his deposition and laicization letters to the Monastic Plaintiffs, Bishop Saba sent three substantively identical letters, one to each of the Monastery Plaintiffs. In each, Bishop Saba made yet another attempt to seize monastic property, this time demanding in writing the "immediate return" of "the holy antimension, the holy chrism (myrrh), and the baptismal registration book of the diocese." These items, according to Bishop Saba, were "the rightful property of the Diocese and must be returned immediately to their ecclesiastical authority."

90. The letters concluded by stating that an archpriest named Pavle Zakaraia (a.k.a. Father Paul) would oversee the implementation of Bishop Saba's demand regarding the items from the Saint Sidónia Monastery and the Holy Spirit Monastery, that Jeffrey Land (a.k.a. Father Basil) would do the same regarding the items from the Saint Iakovos Monastery, and that the Monastery Plaintiffs should facilitate those processes.

91. On March 29, 2025, Father Paul and two laymen arrived at the Saint Sidónia Monastery and the Holy Spirit Monastery and demanded surrender of those monasteries' holy items. Upon their arrival, one of the Saint Sidónia Monastery's Sisters called the police. When the police officer arrived, he advised Father Paul that Bishop Saba would need to file an action for replevin to seize the holy items. Father Paul left the monastery.

### H. Bishop Saba Further Retaliates Against the Monastic Plaintiffs by Publishing False, Defamatory, and Misleading Statements About Them, Which Quickly Spread Online and Across the Country

92. On March 18, 2025, the same day that Hieromonk Ieronymos sent Bishop Saba's deposition and laicization letters to the Monastic Plaintiffs, the Defendants informed the Orthodox community (and, as a result, the public at large) about Bishop Saba's decisions to depose Abbess *Emerita* Aemiliane and laicize Abbot Christophoros and Abbot Athanasios.

93. Despite knowing that Bishop Saba's letters were shams, the Defendants worked in concert to disseminate their false narrative widely. The Defendants took these actions to harm the Monastic Plaintiffs and Monastery Plaintiffs out of vindictiveness and personal animus, wholly divorced from any legitimate purpose.

94. For example, on March 18, 2025—the same day Hieromonk Ieronymos sent Bishop Saba's deposition and laicization letters to the Monastic Plaintiffs—GAOCNA posted an encyclical on its Facebook page announcing the deposition and laicization of the Monastic Plaintiffs.[2]

95. The encyclical stated that, "as of March 17 of this year, the following clergy have been laicized: Abbot Athanasios (Clark) . . . ; Abbot Christophoros (Khadasok)." It further stated: "Additionally, Abbess Aemiliane (Hanson) . . . has been deposed from her position." The encyclical ended by "call[ing] upon the faithful members of the Holy Orthodox Church to take this decision into full consideration."

---

[2] *See* Facebook Post, Georgian Diocese in North America (Mar. 18, 2025), https://www.facebook.com/100064567997597/posts/for-english-scroll-down-%EF%B8%8Fჩრდილოეთ-ამერიკის-ქართული-ეპარქიის-ენციკლიკაჩვენი-ეპარქ/1074268098068780/.

96. The publication of the encyclical was not the only step the Defendants took to harm the Monastic Plaintiffs. Also on March 18, 2025, the Defendants sent a letter from Bishop Saba to Ioannis Lambriniadis ("Archbishop Elpidophoros"). Archbishop Elpidophoros is the Archbishop and Primate of the Greek Orthodox Archdiocese of America, the largest Orthodox Christian jurisdiction in the United States and the largest single representation of Eastern Orthodoxy in North America overall. Archbishop Elpidophoros also serves as Chairman of the Assembly of Canonical Orthodox Bishops of the United States of America (of which Bishop Saba is a member)—an assembly comprised of all active, canonical Orthodox bishops in the United States of America, of every jurisdiction (*e.g.*, Greek, Georgian, Serbian, Bulgarian, Antiochian, Ukrainian, Russian, Albanian, etc.). Both institutions are headquartered in New York City, which is where Archbishop Elpidophoros receives and sends mail.

97. Bishop Saba's March 18, 2025 letter to Archbishop Elpidophoros requested that he spread the news within the Orthodox community that Bishop Saba had deposed and laicized the Monastic Plaintiffs.

98. Per Bishop Saba's written request, Archbishop Elpidophoros did so, in his capacity as Chairman of the Assembly of Canonical Orthodox Bishops, by sending letters on March 19, 2025 to Orthodox leaders—such as Metropolitan Apostolos of New Jersey and Metropolitan Constantine of Denver—and "sharing th[e] information" about "the recent decisions [Bishop Saba] took" to purportedly depose and laicize the Monastic Plaintiffs. Archbishop Elpidophoros characterized Bishop Saba's actions as "play[ing] a vital role in strengthening the unity of the Orthodox Church in the United States" and "pray[ed] that . . . such efforts will continue to reinforce our collective commitment to safeguarding the unity and integrity of Orthodox witness in this country."

99. At least one recipient of Archbishop Elpidophoros' letter, Metropolitan Apostolos of New Jersey (who was subsequently elected Archbishop of Canada), forwarded the letter to the clergy within his jurisdiction via letter dated April 10, 2025.

100. In addition to publishing defamatory statements against the Plaintiffs, Bishop Saba has prohibited individuals from visiting the Monastery Plaintiffs and, upon information and belief, has tacitly or expressly approved of parishes doing the same. For example, two individuals who attend services at the Saint Sidónia Monastery independently informed the monastery that Bishop Saba had told them not to visit the monastery, a fact which caused them great distress given that they considered the monastery to be their spiritual home. Another individual who was a former camper and attended weekly services at the Saint Sidónia Monastery with her family was forbidden by Bishop Saba to serve as a camp counselor. He also told the camper's family that they would be excommunicated if they visited the monastery.

101. In the aftermath of the Defendants' conduct, news of Bishop Saba's deposition and laicization orders has spread quickly and broadly. For instance:

a. The news outlet *Orthodox Christianity* published an article reporting that GAOCNA had "defrocked and removed the heads of three of its monasteries in America" (*i.e.*, the Monastic Plaintiffs);[3]

b. *Orthodox Christianity* promoted the article on X (the platform formerly known as "Twitter");[4]

c. This same article was shared by a Facebook group called "Orthodox Christian Sexual Abuse";[5]

---

[3] *See* Orthodox Christianity, *Heads of Multiple Georgian Monasteries in America Deposed* (Mar. 20, 2025), https://orthochristian.com/168257.html.

[4] X Post, Orthodox Christianity (Mar. 20, 2025), https://x.com/Orthodoxy2019/status/1902710618110456313.

d. The news was shared by the Facebook accounts of Saint Vakhtang Gorgasali Church in North America, the Orthodox Cathedral of the Holy Virgin Protection, and the Metropolitan of the Greek Orthodox Metropolis of Pittsburgh, Savas Zembillas;

e. The popular social media platform Reddit has featured multiple discussions of Bishop Saba's actions;[6]

f. The Greek Orthodox Archdiocese of America published an article recounting a session of the Holy Eparchial Synod of the Greek Orthodox Archdiocese in September 2025, and stating: "[A]ccording to an official document from Bishop Saba, the former abbot Athanasios (Clark), as well as Abbot Christophoros (Khadasok) of the Holy Spirit Monastery in Maryland, were deposed by the Patriarchate of Georgia and returned to the status of simple monastics";[7]

---

[5] Facebook Post, Orthodox Christian Sexual Abuse (Mar. 20, 2025), https://www.facebook.com/groups/Pokrov.org/posts/2441203886228561.

[6] *See, e.g.*, Reddit Post in "r/OrthodoxChristianity," *Georgian Diocese of NA Announcement Deposing Two Abbots and an Abbess* (Mar. 2025), https://www.reddit.com/r/OrthodoxChristianity/comments/1jf0v33/georgian_diocese_of_na_announcement_deposing_two/; Reddit Post in "r/exorthodox," *Finally Georgian Orthodox Eparchy defrocks 3 Monastic Leaders* (Mar. 2025), https://www.reddit.com/r/exorthodox/comments/1jfu3vo/finally_georgian_orthodox_eparchy_defrocks_3/; Reddit Post in "r/SophiaWisdomOfGod," *Heads of Multiple Georgian monasteries in America deposed* (Mar. 2025), https://www.reddit.com/r/SophiaWisdomOfGod/comments/1jfkxut/heads_of_multiple_georgian_monasteries_in_america/; Reddit Post in "r/ChristianOrthodoxy," *Encyclical of the Georgian Diocese of North America from His Grace Bishop Saba on the Monastic Communities that were under "Elder" Dionysios Kalampokas* (Mar. 2025), https://www.reddit.com/r/ChristianOrthodoxy/comments/1jeenu7/encyclical_of_the_georgian_diocese_of_north/; Reddit Post in "r/exorthodox," *Palestinian Orthodox Church of America & St. Nina's Monastery* (Mar. 2025), https://www.reddit.com/r/exorthodox/comments/1jhhddn/palestinian_orthodox_church_of_america_st_ninas/; Reddit Post in "r/Orthodox_Churches_Art," *Sacred Monastery of Saint Nina (Maryland USA)* (Oct. 2024), https://www.reddit.com/r/Orthodox_Churches_Art/comments/1dcrcv5/sacred_monastery_of_saint_nina_maryland_usa/.

[7] Orthodox Observer, *Archbishop Elpidophoros, Synod address monasteries, approve new ministries*, Greek Orthodox Archdiocese of America (Sept. 14, 2025), https://orthodoxobserver.org/archbishop-elpidophoros-synod-address-monasteries-approve-new-ministries/. The article further wrongfully stated that, "on February 27, 2025, the aforementioned

g. On October 17, 2025, *Orthodox Christianity* published an article titled "Georgian Monasteries In U.S. Go Into Schism After Leadership Deposed."[8] The article stated that the Monastic Plaintiffs "were previously deposed [and] have left the jurisdiction of [GAOCNA]." The article also quoted and linked to a post on GAOCNA's Facebook page.[9] According to the Facebook post (which is written in Georgian, but quoted in English in the *Orthodox Christianity* article), Archpriest Zakaraia spoke during an October 11, 2025 Plenary Assembly session which Bishop Saba attended, and reported that the Monastery Plaintiffs had separated from GAOCNA's jurisdiction due to canonical violations, following a supposed investigation that was conducted by the Diocese Commission for Canonical Issues (an entity not mentioned anywhere in the GAOCNA Constitution). The GAOCNA Facebook post also stated that, during the Plenary Session, Bishop Saba "further elaborated on the reasons for these decisions"—though, notably, the post did not include any of these reasons or other such details;

h. On October 22, 2025, the news outlet *Union of Orthodox Journalists* published an article about the Monastery Plaintiffs titled "Three American Monasteries Go Into Schism."[10] The article cited *Orthodox Christianity*'s October 17, 2025 article, discussed in subsection (g) above, and identified each of the Monastic Plaintiffs and the Monastery Plaintiffs by name. The article claimed that the Monastery Plaintiffs "have entered schism following the deposition of their leaders by [GAOCNA]";

i. On November 7, 2025, the Assembly of Canonical Orthodox Bishops of the United States of America published a news release stating, among other things: "The faithful should ensure that before participating in services at monasteries, such monasteries are canonical and approved by their respective Hierarchs. For example, the monasteries (formerly of the Georgian Apostolic Orthodox Church in North America) of 'Saint Nina' (Union Bridge, Maryland), 'Saint Iakovos the "New Studion"' (Piedmont,

---

former abbot Athanasios Clark joined the self-proclaimed 'Greek-Palestinian Orthodox Church' in Pottsville, Pennsylvania, under the similarly self-proclaimed 'Archbishop Aimilianos.'" *Id.*

[8] Orthodox Christianity, *Georgian Monasteries In U.S. Go Into Schism After Leadership Deposed* (Oct. 17, 2025), https://orthochristian.com/173355.html.

[9] *See* Facebook Post, Georgian Diocese in North America (Oct. 15, 2025), https://www.facebook.com/permalink.php?story_fbid=pfbid0PuyKyKSNv8ooNjNW7xJxfsUTdvZao9ytwSGbnSg2oQ7QHUyiJyqCeykeWZw4sMmgl&id=100064567997597.

[10] *See Three American Monasteries Go Into Schism*, Union of Orthodox Journalists (Oct. 22, 2025), https://uoj.news/en/news/85449-three-american-monasteries-go-into-schism.

Oklahoma), and 'The Monastery of the Holy Spirit' (Union Bridge Maryland), . . . fall outside of such approvals";[11] and

j. On April 7, 2026, GAOCNA's Facebook page posted an "Announcement of the Patriarchate of Georgia," which purported that the Patriarchate was "aware" of Bishop Saba's actions.[12] The purported announcement further stated that, "[a]ccording to the explanatory report sent to us by His Grace, Bishop Saba of North America, the abbots were defrocked last year, while the abbess was removed from her leadership position, . . . ."

102. Every time a third party shared the Defendants' representations, that repetition achieved what the Defendants set out to do: to amplify and spread their narrative about the Monastic Plaintiffs and the Monastery Plaintiffs as broadly as possible.

103. The Defendants' false, defamatory, and misleading statements were intended to inflict harm upon the Monastic Plaintiffs and Monastery Plaintiffs and to manipulate public perception to justify the Defendants' conduct and evade accountability.

### I. The Plaintiffs Have Suffered, and Continue to Suffer, Significant Harm Caused by the Defendants' False, Defamatory, and Misleading Statements

104. Few sanctions within the Georgian Orthodox Church are as severe and stigmatizing as deposition and laicization. The former refers to the removal of an individual's office or authority (*e.g.*, the removal of a nun from her position as abbess of her monastery). The latter refers to stripping an ordained individual of all clerical rights, honors, and privileges (*i.e.*, extinguishing the individual's standing as a member of the clergy), or removing an individual from the monastic order, and in either case returning the individual to the lay state.

---

[11] Assembly of Canonical Orthodox Bishops of the United States of America, *Assembly of Bishops XIV Concludes; Discussed the Influx of Converts and Prayed for those Suffering Worldwide* (Nov. 7, 2025), https://www.assemblyofbishops.org/news/2025/aob-xiv-press-release.

[12] *See* Facebook Post, Georgian Diocese in North America (April 7, 2026), https://www.facebook.com/100064567997597/posts/-announcement-of-the-patriarchate-of-georgia-%EF%B8%8F%EF%B8%8F-we-are-aware-of-the-canonical-de/1388317463330507/.

105. Given the nature and severity of these sanctions, the Orthodox community predictably began speculating as to what transgressions would have possibly prompted Bishop Saba to declare such sanctions against the Monastic Plaintiffs. The community has even speculated that the Monastery Plaintiffs have gone into "schism" as a result of the Monastic Plaintiffs' supposed misconduct, which would mean that the Monastery Plaintiffs are no longer part of the Orthodox Church and are hence wholly illegitimate. The Defendants knew, or should have known, that this result was reasonably foreseeable—in other words, that their defamatory statements would create a damaging patina of extreme wrongdoing where none existed.

106. The Defendants' conduct has therefore caused the Monastic Plaintiffs tangible and intangible harm, tarnishing their reputations in their communities at large and causing the Monastery Plaintiffs to suffer significant reputational and economic harm.

107. The Monastery Plaintiffs have suffered numerous harms because of the Defendants' published statements regarding the Monastic Plaintiffs' purported deposition and laicization. These include the following:

a. **Decreased Attendance at Services:** Attendance at services held at the monasteries has dropped dramatically due to the Defendants' defamatory statements. In the aftermath of the Defendants' March 2025 statements, the Saint Sidónia Monastery recorded its lowest attendance at a Sunday Divine Liturgy since its founding in 2012. Similarly, during the months immediately following the initial defamatory statements (which coincided with a high holy period in the Orthodox Christian faith called Great Lent), only two visitors attended a customary Friday night Lenten service—a well-attended service in prior years.

b. **Cessation of Sunday School:** The Saint Sidónia Monastery is not currently able to hold Sunday school for children and concurrent religious discussions for adults, which ordinarily take place each school year, due to the attendance of participants and teachers/assistants being too low to hold those programs.

c. **Donor Cancelations:** Donors have been canceling cash and in-kind donations, as well as visits to the monastery. By way of representative example:

   i. **Donors who regularly donated have ceased doing so:** More than one family that had been donating to the Saint Sidónia Monastery for five to

ten years (including, by way of example, one family that had been donating $400 a month) ceased donating after Bishop Saba's March 2025 statements.

ii. **Donors have withdrawn previously promised high-value donations**: Before the initial defamatory statements were made, one donor who had a tea house and provided the Saint Sidónia Monastery's gift shop with high-quality tea from Georgia had planned to close his shop and donate his remaining inventory and other items to the monastery. This donor also had offered to connect the Saint Sidónia Monastery directly with Georgian tea suppliers so that the monastery could continue to stock its tea. However, after the initial defamatory statements were made, the donor wrote to the monastery and canceled his donation. Since then, the donor and his family have stopped visiting and communicating with the monastery.

iii. **Donors have less frequently donated to the "needs list":** The Saint Sidónia Monastery posts a "needs list" on its website,[13] which donors historically would often consult when determining which items to donate. The needs list was started at the request of pilgrims (*i.e.*, visitors) who intended to visit the Saint Sidónia Monastery and wanted to bring things they knew the monastery needed. However, the monastery has received fewer donations of staple items that are on its needs list.

d. **Decreased Participation in Sacraments:** Participation in confessions at the Holy Spirit Monastery and the Saint Iakovos Monastery—which are offered by Abbot Christophoros and Abbot Athanasios, respectively—has fallen substantially.

e. **Decreased Gift Shop Purchases:** Purchases in the Saint Sidónia Monastery's gift shop, which shares its proceeds as needed with the Holy Spirit Monastery, have declined (as has income received from candles and physical and electronic donation boxes). Sales report data shows that the monastery's gift shop had net sales of approximately $38,200 in 2021, $49,400 in 2022, $65,400 in 2023, and $61,600 in 2024. But in 2025, the year the Defendants made their false, defamatory, and misleading statements, net sales dropped dramatically by approximately 60% to roughly $24,400.

f. **Decreased Coffee Subscriptions:** Many subscriptions for purchases of the coffee that the Saint Sidónia Monastery roasts and sells have been canceled.

g. **Decreased Deposit Totals:** The months following March 2025 recorded some of the lowest deposit totals the Saint Iakovos Monastery had received in recent

---

[13] *See* Sacred Monastery of Saint Sidónia, *Needs List* (Oct. 22, 2025), https://www.saintsidonia-monastery.org/needs-list.html.

years. Unable to pay its electricity bills, Saint Iakovos did not turn on the air conditioning during 104-degree Oklahoma heat in the summer of 2025.

h. **Prohibitions on Visiting the Monasteries:**

i. In one case, a parish priest has forbidden his parishioners from receiving Holy Communion at the Saint Sidónia Monastery, which has led the family to cease attending services at the monastery despite their children having historically served in the altar.

ii. Parishes have been prohibiting their members from visiting and/or participating in any sacraments at the monasteries. Parish priests, obligated by their hierarchs, have further forbidden parishioners' children from attending summer camp at the monasteries. The reputational harm has not been localized: parents in San Diego have said that their parish is prohibiting their children from attending camp at the Saint Sidónia Monastery. In fact, the Saint Iakovos Monastery was unable to host a summer camp in both 2025 and 2026 due to the lack of attendees (and the number of attendees at the Saint Sidónia Monastery's 2026 summer camp represents only a small fraction of its historical attendee numbers).

iii. The father of one of the Saint Sidónia Monastery's Sisters, who himself was a local parish priest and had celebrated at the monastery at least once a week since he was ordained, had not received the blessing to visit the monastery (and no longer blessed his parishioners to do the same). When he passed, he was buried at the Saint Sidónia Monastery pursuant to his wishes—however, only one priest from his jurisdiction was permitted to serve the burial service (and was not permitted to participate in the meal that followed, or any other events held at the monastery), and the funeral preceding the burial took place at another parish.

iv. An Orthodox church in Maryland circulated a parish bulletin referring to the "uncanonical standing of [the Saint Sidónia] Monastery."

v. Pilgrims, upon receiving false information or directives not to visit the Saint Sidónia Monastery, have contacted the monastery in great distress. One questioned why service to the monastery had been restricted. Another said that not being able to attend services at the Saint Sidónia Monastery was his "greatest grief at this time."

i. **Increase in Newsletter Unsubscribers:** The Saint Sidónia Monastery has seen a marked increase in people unsubscribing from its email newsletter, including at least two unsubscribers reporting the newsletters as spam or abuse. One unsubscriber commented that they were cutting ties with the monastery because "Abbess *Emerita* does not exist for a deposed cleric. I'm concerned you are not being obedient to your bishop and our patriarch. No longer interested in connection with you." Another commented that they were unsubscribing because

"[t]here is a lot of unsettling news regarding this place." Another wrote: "now non-canonical, no longer Orthodox"—a theme shared by several other unsubscribers.

j. **Decrease in Newsletter Recipients Opening the Newsletter:** In addition to a rise in newsletter unsubscribers, the Saint Sidónia Monastery has seen a sharp decline in the share of recipients who open its newsletters after receiving them. Before March 17, 2025, more than half of the newsletter recipients opened the newsletters on average; after that date, the average open rate fell to nearly a quarter.

k. **Decreased Pilgrim and Inquirer Visits:** Pilgrims who have arranged to visit the Saint Sidónia Monastery have canceled, citing the situation with Bishop Saba as the reason. One woman, who initially expressed a desire to explore monastic life at the monastery, unsubscribed from the email newsletter and left the following comment: "I understand that your previous Abbess was removed from her position and defrocked but you still list her including her title, which feels like a disobedience to the one who officially removed her, . . . ."

108. These harms, and others, are the direct result of the Defendants' conduct. The Plaintiffs have tried to mitigate their damages—for example, a Saint Sidónia Monastery newsletter referred to the "misinformation to the effect that our Monasteries are no longer canonical." However, because Defendants' conduct has caused the Plaintiffs such extreme harm, the Plaintiffs have been unable to make much, if any, progress rectifying the harm caused.

### J. The Defendants Reject the Plaintiffs' Attempts to Resolve This Dispute

109. On August 9, 2025, the Plaintiffs, through counsel, sent a demand letter to the Defendants to notify them of the Plaintiffs' claims against them and to attempt to negotiate a resolution short of litigation.

110. The Plaintiffs' demand letter set forth the factual and legal basis for their claims against the Defendants, and demanded that the Defendants: (1) cease and desist from making any further false or defamatory statements about the Plaintiffs; (2) formally clarify that the March 17, 2025 "Hierarchical Letters" are shams; (3) issue a public apology and formal written retraction of any statements made to third parties regarding the purported deposition and laicization of the

Monastic Plaintiffs; and (4) state the factual and legal basis for Bishop Saba's position regarding his rights or interests in the Saint Sidónia Monastery's property.

111. On August 29, 2025, the Plaintiffs received a letter response from the Defendants. The letter was signed by Jeffrey Land (a.k.a. Father Basil), who stated that he represented the Defendants.

112. The Defendants' response letter did not state the factual and legal basis for Bishop Saba's position regarding his rights or interests in the Saint Sidónia Monastery's property. Rather, it avoided the issue, stating only that "[a]t no time did Bishop Saba ever assert, or attempt to assert, ownership of the two monasteries in Maryland and Oklahoma." The letter also stated that Bishop Saba "obviously is aware of Article 21.7 of GAOCNA's Constitution since he was the primary drafter."

## II. Governing Documents

### A. GAOCNA's Governing Documents

113. GAOCNA is governed by two primary documents: the GAOCNA Constitution and its by-laws (the "GAOCNA By-Laws").

114. The operative version of the GAOCNA Constitution, which was primarily drafted by Bishop Saba, was purportedly entered into force during the April 25, 2024 session of the Plenary Assembly.

115. Several provisions of the GAOCNA Constitution are relevant.

116. First, Article 6.4 asserts the primacy of the GAOCNA Constitution over GAOCNA's other governing documents: "All governing documents of any Church entity, including Church Charters, Articles of [I]ncorporation, Deeds and By-Laws, must be in agreement with this Constitution. Any provisions inconsistent with this Constitution are of no force or effect."

117. Second, Article 11.1 recognizes that monasteries are "consecrated place[s] with a church and other buildings as a habitation for persons of the monastic order," and that monasteries are "governed according to [their] internal Constitution[s] ratified by the Diocesan Bishop." In Article 21.4, the GAOCNA Constitution further recognizes that "[t]he real and personal property of a monastery shall be purchased, sold, leased, mortgaged or encumbered *pursuant to the terms of its Constitution*" (emphasis added), and that title to a monastery and its property "shall be held by the monastery."

118. Third, the GAOCNA Constitution states the limited situations in which the Diocesan Bishop (currently Bishop Saba) may sanction clerics for transgressions. Specifically, Article 12.8 provides that the Diocesan Bishop must "[s]uspend[] from liturgical-sacerdotal officiation those clerics who appear justly accused of ecclesiastical transgressions and appoint[] their substitutes, until their cases are ruled upon. After obtaining an understanding of the situation through his representative, the Diocesan Bishop may render a decision if he finds that the subject matter is within his exclusive jurisdiction; otherwise, he submits the case to the Diocesan Ecclesiastical Court for action." Article 13.19 vests the power to "[j]udge[] transgressions of Clergy" and "the faithful" in the Diocesan Ecclesiastical Court.

119. Fourth, Article 21.7 provides, in full: "In the event of heresy, schism or defection from the Georgian Apostolic Orthodox Church in North America as demonstrated by the continued disobedience to the directives of the Diocesan Administrative Board, title, management, administration and control of any and all property of an affected Parish, Monastery or other organization shall immediately revert to the Diocesan Bishop for the use and benefit for those who remain loyal to the Georgian Apostolic Orthodox Church in North America."

120. The operative version of the GAOCNA By-Laws became effective in 2024, superseding all prior versions.

121. Consistent with Article 6.4 of the GAOCNA Constitution, described above, the GAOCNA By-Laws state that they are "an appendix to the [GAOCNA] Constitution," and that "[a]ny contradictions or ambiguities between these amended bylaws and the Constitution are to be strictly construed in favor of the provisions of the Constitution."

122. The GAOCNA By-Laws contain no provisions governing title to, ownership of, or disposition of property held by a monastery.

**B. The Monastery Plaintiffs' Governing Documents**

123. The Monastery Plaintiffs are likewise governed by written documents that address ownership, control, and disposition of monastic property. Those documents do not treat monastic property as property of GAOCNA, Bishop Saba, or any individual hierarch. To the contrary, they repeatedly confirm that the Monastery Plaintiffs' property is held by the Monastery Plaintiffs themselves and is inalienable in perpetuity.

124. The Saint Sidónia Monastery operates under its constitution (the "Saint Sidónia Constitution") and its corporate charter (the "Saint Sidónia Charter"). The Holy Spirit Monastery operates under its constitution (the "Holy Spirit Constitution") and its corporate charter (the "Holy Spirit Charter"). The Saint Iakovos Monastery operates under its corporate charter (the "Saint Iakovos Charter").

125. Several provisions of these governing documents are relevant.

126. First, the Monastery Plaintiffs' governing documents protect their property from alienation or outside control. These documents provide that "[t]he present or future property" of the respective monasteries is "inalienable and cannot be liquidated or otherwise restricted in value by transfer or by the granting of rights to third parties." *See* Saint Sidónia Constitution at

Article VII, Section 6; Saint Sidónia Charter at Article VI; Holy Spirit Charter at Article VI; Saint Iakovos Charter at Article VI.

127. Second, the governing documents provide that, in the event any of the Monastery Plaintiffs have no monastics, their respective property will be "managed under guardianship of the then-competent Diocesan ecclesiastical authority," but only until a monastic arrives at the respective monastery, whereupon "the guardianship ceases." *See* Saint Sidónia Charter at Article VII; Holy Spirit Charter at Article VII; Saint Iakovos Charter at Article VII; *accord* Saint Sidónia Constitution at Article X, Section 2. Even in the unlikely event that "there is no possibility of restoration" of a respective Monastery Plaintiff, that entity's property does not transfer to GAOCNA—rather, it vests in the other Monastery Plaintiffs. *See* Saint Sidónia Charter at Article VII; Holy Spirit Charter at Article VII; Saint Iakovos Charter at Article VII.

128. Third, the governing documents expressly provide that they "take precedence over any previous or subsequent Statutes of any ecclesiastical or other authority supervising the [Monastery Plaintiffs]." *See* Saint Sidónia Charter at Transitional Provisions; Holy Spirit Charter at Transitional Provisions; Saint Iakovos Charter at Transitional Provisions.

## COUNT I
## Defamation
## (against all Defendants)

129. The Plaintiffs incorporate the preceding paragraphs.

130. The Defendants published, or caused to be published, to third parties certain false, defamatory, and misleading statements of fact concerning the Monastic Plaintiffs.

131. The statements include, but are not necessarily limited to, written correspondence to third parties and statements made on social media.

132. The statements represented that the Monastic Plaintiffs had been validly deposed or laicized by Bishop Saba. These statements further conveyed, by implication, that the Monastic

Plaintiffs had engaged in conduct so reprehensible that the extreme punishments of deposition or laicization were warranted against them. The Defendants further led third parties to believe that the Monastery Plaintiffs were in schism, creating the baseless appearance that the Monastery Plaintiffs had ruptured from the church, rendering them illegitimate.

133. The statements were false, defamatory, misleading, and unprivileged.

134. In making such statements, the Defendants knew that these statements were false at the time they were made.

135. The Defendants made and published the false, defamatory, and misleading statements maliciously and with the intent to harm the Plaintiffs.

136. Those who read or heard the Defendants' false, defamatory, and misleading statements understood those statements to convey the meaning the Defendants intended.

137. As a direct and proximate result of the Defendants' conduct, the Monastic Plaintiffs have suffered substantial damages, including harm to their reputations, shame, mental anguish, and emotional distress, in an amount to be proven at trial. The Monastery Plaintiffs have also suffered significant economic damages as a direct and proximate result of the Defendants' actions, in an amount to be proven at trial.

**COUNT II**
**Invasion of Privacy: False Light**
**(against all Defendants)**

138. The Plaintiffs incorporate the preceding paragraphs.

139. The Defendants published, or caused to be published, to third parties certain statements and representations concerning the Plaintiffs that portrayed them in a false light before the public.

140. The false light in which the Plaintiffs were placed would be highly offensive to a reasonable person.

141. The statements created the false impression that the Monastic Plaintiffs had been validly deposed or laicized by Bishop Saba, and that the Monastic Plaintiffs had engaged in conduct so reprehensible that the extreme punishments of deposition or laicization were warranted against them. The statements also created the false impression that the Monastery Plaintiffs were in schism and had been severed from the church.

142. The statements were false, defamatory, misleading, and unprivileged.

143. In making such statements, the Defendants knew that these statements were false at the time they were made.

144. The Defendants made and published the false, defamatory, and misleading statements maliciously and with the intent to harm the Plaintiffs.

145. As a direct and proximate result of the Defendants' statements, the Monastic Plaintiffs have suffered substantial damages, including humiliation, embarrassment, emotional distress, and other damages in an amount to be proven at trial. The Monastery Plaintiffs have also suffered significant economic damages as a direct and proximate result of the Defendants' actions, in an amount to be proven at trial.

## COUNT III
**Declaratory Judgment – 28 U.S.C. § 2201**
**(against Defendant Bishop Saba)**

146. The Plaintiffs incorporate the preceding paragraphs.

147. Pursuant to 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal relations of any interested party seeking such declaration" in a case of actual controversy.

148. This action presents an actual controversy within the meaning of Section 2201(a).

149. The Defendants are the bishop and "Chief Secretary," respectively, of GAOCNA, which is purportedly governed by the GAOCNA Constitution.

150. Article 21.7 of the GAOCNA Constitution is titled "Heresy, Schism or Defection," and provides: "In the event of heresy, schism or defection from [GAOCNA] as demonstrated by the continued disobedience to the directives of the Diocesan Administrative Board, title, management, administration and control of any and all property of an affected Parish, Monastery or other organization shall immediately revert to the Diocesan Bishop for the use and benefit for those who remain loyal to [GAOCNA]."

151. A dispute has arisen between the parties concerning Article 21.7. Specifically, the Defendants believe that Bishop Saba can claim title to the Monastery Plaintiffs' property pursuant to Article 21.7. Plaintiffs disagree with the Defendants' position, including because: (1) the Monastery Plaintiffs' property cannot "revert" to Bishop Saba (because the property was not Bishop Saba's before it became Plaintiffs'); (2) the Monastery Plaintiffs never received any directives from the Diocesan Administrative Board (and therefore could not have acted in "disobedience" to such directives, let alone "continued" disobedience); and (3) there is a fundamental conflict between Article 21.7 of the GAOCNA Constitution and the Monastery Plaintiffs' governing documents, which have no trust clause and specifically provide that the Monastery Plaintiffs' property is "inalienable."

152. The Plaintiffs are "interested part[ies]" within the meaning of Section 2201(a), as they have a direct and substantial interest in the proper interpretation of Article 21.7.

153. Declaratory relief will serve the useful purpose of clarifying and settling the rights and legal relations between the Plaintiffs and the Defendants.

154. The Plaintiffs accordingly seek a declaration from this Court that Bishop Saba has no right, under any circumstance, to claim title to the Monastery Plaintiffs' property under Article 21.7 of the GAOCNA Constitution.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, the Plaintiffs demand a trial by jury on all triable issues.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray for judgment entered in their favor and against the Defendants as follows:

a. Awarding compensatory damages, including general and special damages, in an amount to be determined at trial, for the harms the Defendants' conduct caused the Plaintiffs to suffer;

b. Awarding punitive damages, in an amount to be determined at trial, sufficient to punish the Defendants for willful and malicious conduct and to deter such conduct in the future;

c. Entering an order directing the Defendants to retract or remove the false, defamatory, and misleading statements, and enjoining the Defendants from further publishing or disseminating the same or similar false, defamatory, and misleading statements concerning the Plaintiffs;

d. Declaring that Bishop Saba has no right, under any circumstance, to claim title to the Monastery Plaintiffs' property under Article 21.7 of the GAOCNA Constitution;

e. Awarding pre-judgment and post-judgment interest;

f. Awarding the costs and disbursements of this action, including reasonable attorneys' fees, as permitted by law; and

g. Awarding such other relief as the Court deems just and proper.

Dated: August 14, 2026

Respectfully submitted,

SPIRO HARRISON & NELSON

Evan Bianchi
100 Pearl Street, Suite 1803
New York, NY 10004
(646) 412-5616
ebianchi@shnlegal.com

*Counsel for the Plaintiffs*